**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : |  |
| : | **Case No. 23-cr-2 (JEB)** |
| **v.** : |  |
| : |  |
| **WILLIAM COTTON,** : |  |
| : |  |
| **Defendant** : |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant William Cotton to 21 days of incarceration and $500 in restitution.

**I.    Introduction**

Defendant William Cotton participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

1

Cotton pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 21 days of incarceration is appropriate in this case because Cotton (1) entered the U.S. Capitol despite observing what he described as "chaos" outside the building, hearing what he described as a "shot," and seeing rioters who were "prepared" to be there, (2) participated in a "traitor" chant while standing in front of a line of police officers inside the U.S. Capitol, (3) spent approximately 24 minutes walking through multiple areas of the building, and, (4) has no remorse for his actions, telling the FBI that his case "doesn't really mean that much" to him because "it's a misdemeanor."

The Court must also consider that Cotton's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Cotton's crime support a sentence of 21 days incarceration and $500 restitution in this case.

**II.    Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 23 (Statement of Offense), at 1-3.

*Cotton's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Cotton travelled from Rhode Island to Maryland with plans to attend the Stop the Steal rally the following day. On January 6, Cotton drove into Washington, D.C. and attended the rally at the Ellipse. After the rally, Cotton marched with the crowd to the Capitol When he arrived at the Capitol, Cotton saw a scene that he later described as "just chaotic." While on Capitol Grounds, he observed people being hit, police defending themselves by using tear gas

against the rioters, and rioters damaging windows. As he later admitted, Cotton understood that many of the rioters were "prepared" for violence and believed the building was being defended by law enforcement snipers. Despite the chaos, Cotton was undeterred and he continued to move forward, through the crowd, towards the Capitol.



*Image One: Cotton climbing the stairs to the Upper West Terrace (Exhibit 1 at 0:00)*

After reaching the West Front of the Capitol, Cotton climbed a set of stairs underneath the scaffolding of the inaugural stage to reach the Upper West Terrace. Once there, he saw rioters damaging windows with poles. Cotton watched a crowd of rioters rush into the Capitol, likely through the Senate Wing Door, at which point he heard what he later described as a "shot." Despite witnessing these riotous acts, Cotton pressed ahead, moving with the wave of rioters and entering the Senate Wing Door at 2:51 p.m.  An alarm blared.

3



*Image Two: Cotton shortly before entering the Senate Wing Door*



*Image Three: Cotton enters the Senate Wing Door at 2:51 p.m. (Exhibit 2 at 3:19)*

Once inside, he moved towards a line of police officers standing at the north end of the Senate Wing Door lobby. At 2:55 p.m., Cotton began to chant "traitor" over and over with the crowd, a chant directed at the heavily outnumbered police.



*Image Four: Cotton chanting "traitor" with the crowd in front of police officers (Exhibit 3 at 0:11)*

After the chant subsided, Cotton stayed with the crowd and stood in front of the police line for an additional six minutes before moving south towards the Crypt. In doing so, he stepped around an obviously overturned display. Exhibit 3 at 12:05.



*Image Four: Cotton enters the Crypt at 3:02 p.m.*

5

Several minutes later, he returned to the Senate Wing Door lobby where he remained standing next to a broken window with its shattered glass on the floor. A deafening alarm continued to sound. *See* Testimony of Lt. Scott Grossi, *United States v. Christopher Price and Cynthia Ballenger*, 21-cr-719 (JEB), Trial Tr., Mar. 20, 2023, 76:17-24 ("There were . . . sirens going off all the time, continuously. . . . [i]t was deafening to the point that you couldn't really hear the people right next to you . . . ."). At 3:16 p.m., a large group of police officers began to corral Cotton and other rioters out of the Capitol. Only at this point did Cotton leave the building, approximately 24 minutes after entering. Exhibit 4 at 9:30-9:42.



*Image Five: Cotton leaving the Senate Wing Door flanked by police officers (Exhibit 4 at 9:40)*

*Cotton's Post-Arrest Interview*

After his arrest on December 7, 2022, Cotton voluntarily sat for an interview with the FBI. Cotton admitted being in Washington, D.C. on January 6 and that he saw "chaos" outside the Capitol. As already noted above, Cotton provided several details about what he saw outside of the building, including rioters who looked "prepared" to be in the riot based on the masks that they were wearing, property damage, tear gas, and physical violence. He also stated that he learned that

6

someone had been shot inside the Capitol before he entered.[2] When asked about his reaction to what he saw, Cotton said he thought, "the shit's not supposed to happen," and at times he felt threatened.

Cotton, however, claimed he could not remember going inside the Capitol.[3] After being shown videos of himself standing in the Senate Wing Door lobby, Cotton identified himself, but still said that he could not remember being in the Capitol. When the FBI suggested Cotton was not giving "the full picture," Cotton said that he has "been through [this] before," in an apparent reference to his prior criminal history, and minimized the seriousness of his crime, saying, "It's a misdemeanor. It doesn't really mean that much to me so I would tell ya everything."

*The Charges and Plea Agreement*

On December 6, 2022, the government charged Cotton by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1)-(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 7, 2022, law enforcement officers arrested him in Ashaway, Rhode Island. On January 3, 2023, the government charged Cotton by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1)-(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 27, 2023, pursuant to a plea agreement, Cotton pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Cotton agreed to pay $500 in restitution to the Architect of the Capitol.

---

[2] Later in the interview, Cotton said he did not know whether he heard the shot before or after he went inside the Capitol. However, he first discussed the shot when describing the "chaos" he saw as he initially approached the Capitol.

[3] The government is aware that the defendant suffered two strokes after the riot, but before this interview. PSR ⁋ 47. The defendant also provided the government with a letter from his doctor, which confirms that memory loss is among his symptoms from the strokes. Thus, the government cannot necessarily equate his failure to remember entering the Capitol with a lack of candor with the FBI.

### III.  Statutory Penalties

Cotton now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days of incarceration and $500 restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. [This was] an attack on our democracy itself[,] an attack on the singular aspect of democracy that makes America, America, and that's the peaceful transfer of power." *United States v. Kevin Cronin*, 22-cr-233 (ABJ), Sentencing Tr., Jun. 9, 2023, 20:6-10 (statement of Judge Berman Jackson). While assessing Cotton's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Cotton, the

absence of violent or destructive acts is not a mitigating factor. Had Cotton engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Cotton's case is how many warning signs he ignored, telling him he shouldn't be on the Capitol Grounds. During his interview with the FBI, Cotton admitted that when he arrived at the Capitol, what he saw was "just chaotic." He learned someone was shot inside the building and he saw people with masks on who looked "prepared" for the riot. Cotton saw tear gas, physical violence, and rioters breaking windows. He also thought he saw law enforcement snipers in the area. After seeing this upheaval, he thought, "the shit's not supposed to happen," and he felt threatened. Yet, despite all of these warning signs, Cotton chose to move forward into the chaos. He then entered the Capitol within two minutes of the second breach of the Senate Wing Door, on the heels of rioters who had overpowered police and pushed them back to the corner of the lobby. As the Court likely knows, the breach of this door, which occurred twice, was one of the most significant on January 6. Cotton contributed to it.

Cotton also showed a lack of respect for the police officers that were defending the Capitol during the riot. As a mass of rioters formed inside the Capitol at the Senate Wing Door, he chanted "traitor" multiple times in the face of a line of police officers. This act was not an ordinary show of defiance, but an act of intimidation. Cotton was part of a crowd that was much larger than the small police line, a crowd that had shoved officers back and violently breached the area just minutes before. The angry fervor of the chant sent a chilling message to the officers whose backs, in that moment, were literally against the wall.

As this area cleared of people, rather than leaving the building, he continued to wander towards the Crypt and back. For Cotton, the presence of the police officers did not mean he should leave. Instead, he ignored them to continue about the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 21 days of incarceration in this matter.

### B. Cotton's History and Characteristics

As set forth in the PSR, Cotton has a minimal criminal history with the only charges on his record dating back over 30 years ago. PSR ¶ 29-30. However, his record should be viewed in light of his lack of remorse for his actions on January 6. In his interview, Cotton told the FBI that he has "been through [this] before," referring to his two felony drug offenses, with the later of the two involving six months incarceration with an additional 18 months to serve if he violated probation. *Id.* But this history did not deter him on January 6, and by contrast, he believes his charge in this case "doesn't really mean much." Thus, his dated criminal record is not a mitigating factor. Rather, Cotton's record provides context for why he feels entitled to trivialize this case and his actions.

While Cotton suffers from several medical conditions, PSR ¶ 44-48, none of them prevented him from travelling to Washington, D.C. in the middle of the Covid-19 pandemic, marching from the Ellipse to the Capitol, climbing up several stairs, and spending nearly a half hour in the Capitol chanting and walking around. While medical conditions may be a mitigating factor in some cases, Cotton was clearly able to disregard his conditions to participate in the riot. Thus, Cotton's medical status is not a mitigating factor.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation,

I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This

11

was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Cotton has never expressed remorse for his actions, either in the aftermath of his arrest, or even when interviewed by Probation. To the contrary, Cotton does not view this case or his participation in the January 6 riot as serious. Indeed, when the FBI asked Cotton if he remembered going into the Capitol, he said he couldn't remember. When pressed further, he said, "[This is] a misdemeanor. It doesn't really mean that much to me so I would tell ya everything." Put differently, Cotton does not take this case seriously because he does not expect this Court to take it seriously. This conception of criminality, where the potential punishment dictates the wrongfulness of an act, speaks volumes. Cotton appears more willing to take an action when he believes the punishment will be comparatively light. This view requires specific deterrence to stop Cotton from committing additional criminal acts in the future.

E. **The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

12

Court must sentence Cotton based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cotton has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

13

sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the

Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar). Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mandy Robinson-Hand*, 22-cr-111 (JEB), the defendant saw many of the same chaos as Cotton including tear gas deployed against rioters, physical violence, and breaches of police lines. Once inside the Capitol, the defendant chanted "take it back" along with other rioters and moved to multiple parts of the building. After the riot, the defendant expressed no remorse in messages to her children and deleted a Facebook post describing her conduct. This Court sentenced the defendant to 20 days of incarceration, 6 months of probation, and $500 restitution.

In *United States v. Emily Hernandez*, 21-cr-747 (JEB), the defendant watched rioters breach multiple police lines, moved into multiple areas of the Capitol, including the Speaker's Office, and stole various items from the grounds. Unlike Cotton, however, the defendant did not have a criminal record and did not minimize her conduct after the fact. This Court sentenced the defendant to 30 days of incarceration, 12 months of supervised release, $500 restitution, and 80 hours of community service.

In *United States v. Rafael Valadez*, 21-cr-695 (JEB), the defendant took several videos both inside and outside of the Capitol, in which he expressed support for the riot. The defendant also breached the Senate Wing Door and then joined a rush of rioters who breach a police line in the

Crypt. After the riot, the defendant likely deleted the videos he captured and justified the riot on social media. This court sentenced the defendant to 30 days incarceration and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cotton must pay $500 in restitution, which reflects in part the role Cotton played in the riot on January 6.[6] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD). Cotton's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 80.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 days of incarceration and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:    s/ *Andrew Haag*
        Andrew S. Haag
        Assistant United States Attorney
        MA Bar No. 705425
        601 D Street N.W.
        Washington, D.C. 20530
        Andrew.Haag@usdoj.gov
        202-252-7755